U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2017 JAN 26  PM 1: 50

CLERK

BY_____
DEPUTY CLERK

GEORGE K. HOLSTEIN, JR.          )
                                 )
          Plaintiff,             )
                                 )
     v.                          )     Case No. 2:15-cv-255
                                 )
NANCY A. BERRYHILL,              )
Acting Commissioner of Social Security,  )
                                 )
          Defendant.             )

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR AN ORDER
REVERSING THE COMMISSIONER'S DECISION AND GRANTING THE
COMMISSIONER'S MOTION TO AFFIRM**
(Docs. 12 & 17)

Plaintiff George K. Holstein, Jr. is a claimant for Social Security Disability
Insurance Benefits ("DIB") under the Social Security Act ("SSA"). He brings this action
pursuant to 42 U.S.C. § 405(g) to reverse the decision of the Social Security
Commissioner that he is not disabled. Plaintiff filed his motion to reverse on April 25,
2016. (Doc. 12.) The Commissioner filed her motion to affirm on August 4, 2016.
(Doc. 17). The court took the matter under advisement on August 22, 2016.

Plaintiff is represented by John C. Mabie, Esq. The Commissioner is represented
by Special Assistant United States Attorney Sandra M. Grossfeld.

Plaintiff raises the following issues: (1) whether Administrative Law Judge
("ALJ") Matthew Levin erred in determining that Plaintiff's severe impairments do not
meet the requirements of the Listings; (2) whether ALJ Levin erred in his residual
functional capacity ("RFC") analysis; (3) whether ALJ Levin demonstrated bias; and
(4) whether evidence which became available in March of 2016 requires a remand.

**I.    Procedural History.**

On August 28, 2012, Plaintiff filed for DIB benefits alleging that he was disabled
as of July 30, 2011. The Commissioner initially denied his claims on November 21,

2012, and again on reconsideration. On January 29, 2013, Plaintiff filed a timely request for a hearing before an ALJ.

At a May 13, 2014 hearing before ALJ Levin, Plaintiff appeared with John Pyatak, Esq. and testified. Vocational expert ("VE") Louis Laplante also testified. On June 12, 2014, ALJ Levin issued a written decision finding that Plaintiff was not disabled. The Appeals Council denied Plaintiff's request for review on October 1, 2015. As a result, ALJ Levin's decision stands as the Commissioner's final decision.

## II.   Factual Background.

Plaintiff is a forty-seven year old, left-handed male with a 10th grade education. He served in the Navy from 1988 to 1991 when he received a general discharge. Since his discharge, he has held jobs at restaurants, in sales, as an automotive technician, and in retail establishments. Plaintiff stopped working in July of 2011, citing problems with his knees, back, and anger issues. Plaintiff is separated from his wife, has three children, and lives with his girlfriend and one of his sons.

### A.   Medical History.

In December of 2008, Plaintiff began treatment at Department of Veterans Affairs ("VA") medical facilities in Vermont. At a December 8, 2008 primary care session, Plaintiff raised concerns regarding his sleep, pain in his lower back and right knee, and hearing loss. Plaintiff was referred to sleep and audiology specialists for evaluation. Plaintiff was also screened for depression and post-traumatic stress disorder ("PTSD"), but each was initially assessed as negative.

#### 1.   Knee and Back Pain Treatment History.

During the December 8, 2008 primary care session, Plaintiff reported experiencing pain in his back and right knee since his fall from a ladder while in the Navy. He asserted that the pain causes him to walk "funny" which then causes other joints to hurt. (AR 523.) He stated that Motrin eased the pain. An x-ray of his knees was unremarkable.

During a February 2010 primary care session, Plaintiff complained of joint pain stemming from his "crooked" walk to accommodate pain in his left knee. (AR 518.) Plaintiff stated that he was never pain free and that Ibuprofen 800mg six times per day

2

was ineffective to control his pain. Plaintiff was advised to try other over-the-counter medications with the option of a knee injection if his pain persisted. The following month, however, Plaintiff reported that the pain in his right knee had increased significantly. Plaintiff walked with a limp, and his right knee was observed as tender but stable. Plaintiff was prescribed a small dose of Percocet, provided with a brace and cane, and scheduled for an MRI the following month, which revealed the presence of fluid in his knee but no damage.

In September of 2010, after complaining of continued pain in his right knee, Plaintiff was prescribed Salsalate and referred to Philip Hershberger, M.D. for an orthopedic consultation. Plaintiff reported to Dr. Hershberger that his knee pain increased with prolonged walking and use of stairs, that he hears popping noises in his knee, and has occasional swelling. Plaintiff also indicated that the pain medication was helping. Dr. Hershberger observed that Plaintiff's gait was satisfactory, that he was able to heel and toe walk, and that he exhibited mild loss of sensation in some of his toes. Dr. Hershberger assessed Plaintiff as having some degenerative changes and recommended Plaintiff continue with pain medication and avoid aggravating factors.

Two months later, in December of 2010, Plaintiff told his primary care provider that "everything hurts from his low back to his hips to his knees." (AR 466.) Plaintiff requested medication because the pain was interfering with his work.

In March of 2011, Plaintiff met with Dr. Hershberger and reported that his knee pain was worse after a full day of work. He noted he was taking Ibuprofen for pain and the use of a brace was helping. Dr. Hershberger assessed Plaintiff's gait as satisfactory, but described it as slow and deliberate. Plaintiff was still able to perform a heel and toe walk, his decreased sensation in his toes was still present, and his range of movement in his hips was satisfactory. An MRI of his knees revealed no significant degenerative changes. The next month, Plaintiff was referred to physical therapy after he complained that he was unable to stand on his own power while at work. Plaintiff was assessed as having a herniated lumbar disc and provided with a program of stretching. An MRI of Plaintiff's back from April of 2011 showed "mild-broad based disc bulge, bilateral facet

3

arthropathy and ligament flavum hypertrophy, causing mild narrowing of the central canal and bilateral neuroforamina" at the L5-S1 level. (AR 1211.) It was noted that the "L5 nerve root within the neural foramen is not well-seen and may be impinged by the adjacent facet arthropathy." *Id.* Clinical correlation was requested.

On November 28, 2011, Plaintiff reported to Dr. Hershberger that he continued to experience knee and back pain and that he had to quit his job because it involved repetitive kneeling activities. Dr. Hershberger observed that Plaintiff's gait remained satisfactory, that he was still able to heel and toe walk, and that other than decreased sensitivity in some of his toes, his sensation to touch was satisfactory.

In October of 2012, Plaintiff reported that his back pain would not stop and that he could "no longer take it." (AR 1064.) He stated that he had tried several varieties of pain medication to no avail and felt that he could no longer be active out of fear that significant pain would follow. He reported that the stretching routines he learned at physical therapy helped with flexibility but not pain. He was observed as having an antalgic gait and prescribed Flexeril and Vicodin. The following month Plaintiff described his pain as continuing but stated that the Vicodin helped ease the pain.

In 2013, Plaintiff's knee pain continued to worsen but his back pain appeared stable. In April and June, Plaintiff reported experiencing pain and popping in his knee while working on his motorcycle and described his knee pain as worse than his back pain. Dr. Hershberger assessed Plaintiff's gait as "fairly good" in August. (AR 1403.) In September, Plaintiff reported falling twice after his knee unexpectedly popped, that he had difficulty getting up without the use of his arms, and that when he kneels it "feels like kneeling [on] a rock or gravel." (AR 1393.) Plaintiff reported redness and swelling in his knees after long bike rides or raking the lawn. Dr. Hershberger described Plaintiff's gait as "satisfactory" in December. (AR 1375.) MRIs taken throughout 2013 showed that Plaintiff's left knee had mild degenerative changes, but were otherwise unremarkable and revealed normal joint spaces with no effusion.

4

## 2. Mental Impairment Treatment History.

Plaintiff first sought treatment for mental health issues in January of 2011 at a VA medical facility in Vermont after an argument with his girlfriend. At that time, Benjamin Wood, M.D. preliminarily assessed Plaintiff as having anxiety disorder with agoraphobia, PTSD, panic disorder, obsessive compulsive disorder ("OCD") or obsessive compulsive personality disorder ("OCPD"), and depression. Dr. Wood noted that further evaluation would be required before a conclusive diagnosis could be made. Since that time, Plaintiff has remained in continuous treatment and has been diagnosed with general anxiety disorder ("GAD"), OCD, depressive disorder, personality disorder, and PTSD. He has participated in both individual and group counseling sessions and is on prescription medication, including Vicodin, Naproxen, Flexeril, and Tylenol with Codeine.

From 2011 through March of 2014, Plaintiff had regular appointments with various treating physicians, psychologists, nurses, and social workers, including Dr. Wood, William Tobey Horn, M.D., Ann Kraybill, LICSW, psychologists Sarah Kohl and Fred Elliott, and advanced practice registered nurse Deborah Collins. Treatment records from these sources indicate that Plaintiff's counseling sessions focused mainly on his GAD, OCD/OCPD, and PTSD diagnoses, and reveal that Plaintiff has anger issues, obsessive compulsions, and panic attacks. Plaintiff also experiences flashbacks, intrusive thoughts, and hypervigilance related to a helicopter crash involving his friends during his military service. Additionally, Plaintiff suffers from a number of phobias, including fear of drowning and of heights, xenophobia, agoraphobia, claustrophobia, and social phobia.

## B. VA Assessments of Plaintiff's Physical and Psychological Impairments.

In 2010, Plaintiff sought an increase in his 20% VA disability rating (10% for back strain; 10% for limited flexion of knee) stemming from his physical impairments. On October 26, 2010, the VA requested that Brian Carney, M.D. review Plaintiff's medical records and meet with Plaintiff for a physical examination. In mid-November of 2010, Dr. Carney reviewed Plaintiff's medical records and performed a physical evaluation to assess Plaintiff's claims of pain in both knees, and pain in his right ankle and hip. Following this assessment, Plaintiff's VA disability rating for his back

5

(vertebral fracture or dislocation) was adjusted to 20%; Plaintiff's knee remained at 10%. Plaintiff reported no trauma to any of his other joints. He was observed as walking with an antalgic gait and it was recorded that his right shoe showed increased wear on the outside edge of the heel.

Dr. Carney's review of Plaintiff's medical history revealed that Plaintiff had a limitation on standing to thirty minutes, a functional limitation on walking to eighty yards, and that Plaintiff always used a cane and a brace for assistance. In his physical examination, Dr. Carney noted that Plaintiff exhibited tenderness, instability, and guarding of movement in his right knee. Dr. Carney described the instability as "moderate," but observed no grinding or other noises. (AR 316.) Dr. Carney concluded that Plaintiff's right knee injury had a significant impact on Plaintiff's "usual occupation" as a mechanic, including: decreased mobility, problems with lifting and carrying, difficulty reaching, a lack of stamina, weakness or fatigue, decreased strength, and pain in his lower extremities. (AR 319.)

With regard to Plaintiff's left knee, Dr. Carney observed tenderness without instability. No grinding noises were noted. He recorded that there was "objective evidence of pain [in Plaintiff's left knee] with active motion on the right side." (AR 317) (capitalization omitted). Dr. Carney concluded that Plaintiff's left knee pain would have the same impact on Plaintiff's work as a mechanic as his right knee pain. Dr. Carney noted that although there was no objective evidence of pain with active motion on the left side of Plaintiff's hip, there was after repetitive motion on his right side. He assessed a decreased range of motion in both of Plaintiff's hips.

Dr. Carney opined that Plaintiff's left knee, right ankle, and right hip pain were all either caused by or more likely than not caused by the strain stemming from Plaintiff's altered gait due to his right knee pain. Dr. Carney explained that Plaintiff's altered gait was a "plausible biological mechanism" by which Plaintiff's other joint pain would occur

6

and would increase the likelihood of strain and degenerative changes in Plaintiff's other joints. (AR 327.)[1]

On March 13, 2012, Plaintiff was evaluated by psychologist Gail Isenberg, Ph.D. at the request of the VA after Plaintiff applied for an increase in his disability rating following his PTSD diagnosis. Dr. Isenberg's evaluation resulted in an increase in Plaintiff's VA disability rating for PTSD to 70%. In addition to PTSD, Dr. Isenberg noted that Plaintiff had also been diagnosed with a personality disorder and alcohol abuse. Plaintiff was found to have "[o]ccupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking and/or mood," but she recorded that it was not possible to differentiate which portion of these impairments was caused by Plaintiff's mental health diagnosis as opposed to his personality disorder. (AR 740.)

During Dr. Isenberg's evaluation, Plaintiff described his childhood as happy and reported that he had several close friends and enjoyed social activities, including boy scouts, hunting and fishing, working on cars, and team sports. Dr. Isenberg noted that this description varied from therapy records from 2011 which revealed that Plaintiff had a history of being bullied as a child. In the Navy, Plaintiff had many friends "that he felt were like family," but noted that he preferred to be alone on occasion. (AR 742.)

Following his discharge from the Navy, Plaintiff was married twice. At the time of the evaluation, Plaintiff had been in a relationship with his then-girlfriend for three

---

[1] Dr. Carney also noted "other significant physical findings":

1. [Plaintiff] entered/exited exam room without assist device.
2. [Plaintiff] doffed/donned shoes, socks, pants, and shirt on own.
3. [Plaintiff] got on/off exam table on own.
4. [Plaintiff] stood with BILATERAL knee flexion of 10 degrees.
5. RIGHT knee supine passive extension 20 degrees short of neutral.
6. LEFT knee supine passive extension 5 degrees short of neutral.
7. Foot circumference- RIGHT= LEFT at 26cm.
8. Ankle circumference- RIGHT= LEFT at 28cm.
9. Calf circumference- RIGHT/42cm, LEFT/41cm.
10. Knee circumference- RIGHT= LEFT at 39cm.
11. Thigh circumference- RIGHT/47cm, LEFT/48cm.

(AR 318.)

years and had custody of one of his children. Dr. Isenberg observed that a psychotherapy note from 2011 stated that Plaintiff had reported being "in the process of contesting paternity" with regard to one of his children. *Id.* Plaintiff reported having approximately four friends in the community whom he met through work. He enjoyed activities with his friends, including "riding motorcycles, watching movies, going to the gun range, and getting together for fun." *Id.* Plaintiff was not involved in any service, spiritual, or civic organizations.

Plaintiff reported that in 1990, while still in the Navy, he was stationed aboard a ship with helicopters and there was an accident in which a helicopter crashed into the ocean. Plaintiff reported that for "[t]he next several days they retrieved parts of machine and sailors" and that Plaintiff felt that the men had "died for nothing." (AR 744) (internal quotation marks omitted). Plaintiff described that "[t]he brains looked like sushi." *Id.* Thereafter, Plaintiff reported that he was in shock and wanted to be left alone and felt "pissed off" and sad. (AR 745) (internal quotation marks omitted). Plaintiff further reported experiencing nightmares of helicopter and airplane crashes and reported that his then-girlfriend would sleep in another room because he would re-enact these events in his sleep. Since that time, he has avoided helicopters and airplanes.

Dr. Isenberg concluded that the helicopter-crash experience was sufficient to support a diagnosis of PTSD, with symptoms of anxiety, chronic sleep impairment, difficulty in adapting to stressful circumstances (including work or a work-like setting), and "[t]eariness." (AR 747.) She cautioned that this diagnosis was based on Plaintiff's self-report of the helicopter crash and his subsequent symptoms.[2] In a subsequent

---

[2] Dr. Isenberg also noted that "[o]f concern, however are the several discrepancies between the information provided by [Plaintiff] in this exam and the mental health notes from providers at the WRJ VA as well as a psychological report/evaluation completed May 1991 when [Plaintiff] was on active duty." (AR 747.) Dr. Isenberg noted that a June 1990 mental health evaluation revealed: Plaintiff had been dropped from "A-school due to his inability to maintain an appropriate grade point average," (AR 742); Plaintiff "was suspended from school multiple times for fighting and eventually dropped out of school in the 10th grade," (AR 743); and although Plaintiff stated that boot camp "gave [him] a work ethic" and that he "succeeded," Plaintiff had a "number of disciplinary actions . . . brought against him while in boot camp," (AR 744) (internal quotation marks omitted). Plaintiff also stated that he had been sober since 2010, but a mental

consultation one month later, Dr. Isenberg wrote that "[w]hile [Plaintiff's] PTSD impacts his ability to work with others, he has the skills and ability to work in environments that allow for autonomy." (AR 694-95.) Dr. Isenberg also noted that Plaintiff's "long history of conflicts with authority existed prior to the military and are, in part, consistent with his [personality disorder]." (AR 695.)

## C.    November 2012 Non-Examining State Consultants' Assessments.

On November 16, 2012, State Agency Medical Consultant Elizabeth White, M.D. conducted a physical RFC assessment. Dr. White noted that: (1) Plaintiff's medical records from November of 2010 through July of 2011 showed that Plaintiff's gait was described as normal or satisfactory; (2) x-rays of Plaintiff's knees showed early degenerative joint disease; (3) Plaintiff had mild crepitation but no instability in his knees; and (4) Plaintiff was able to toe and heel walk.

Dr. White opined that Plaintiff could lift ten pounds occasionally and less than ten pounds frequently; could stand and/or walk about four hours during an eight hour work day; could sit a total of six hours during an eight hour work day; had limited ability to push and/or pull in his lower right extremities; could occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl; could never climb ladders, ropes, or scaffolds; and had no limitations as to balance. Dr. White noted that, due to Plaintiff's "severe pulmonary insufficiency," he must avoid all exposure to fumes, odors, dusts, gases, and poorly ventilated areas. (AR 90.) She also stated that Plaintiff must avoid even moderate exposure to hazards such as machinery and heights and that, due to his right knee impairments, walking on uneven surfaces should be limited.

On November 22, 2012, State Agency Medical Consultant Ellen Atkins, M.D. conducted a psychiatric review technique ("PRT") assessment and a mental RFC assessment, based on her review of Plaintiff's medical records. In conducting the PRT assessment, Dr. Atkins found that the totality of the evidence supported Plaintiff's

health note from January 18, 2011 stated that Plaintiff "drinks now from time to time 'with the boys' when they come over, 1/2 gallon of jack, GF drinks beer. x1 DUI in VT. Seems to be pattern of binge drinking as he sometimes goes for long periods of time without drinking." *Id.*

9

allegations of anxiety, depression, OCD, and PTSD, but that he nonetheless retained significant residual capacities. Dr. Atkins indicated Plaintiff had "severe" mental impairments of anxiety disorder, affective disorder, and personality disorder. (AR 86.) Dr. Atkins concluded that Plaintiff's anxiety and affective disorders imposed "mild" restrictions on his activities of daily living, and that he suffered from "moderate" difficulties in maintaining social functioning and concentration, persistence, and pace. (AR 87.) No repeated episodes of decompensation of extended duration were noted.

Dr. Atkins found that Plaintiff was "moderately limited" in his ability to maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted, complete a normal workday and workweek without interruption from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (AR 91.) She opined that "[e]pisodic exacerbations in anxiety/depressive symptoms can temporarily undermine [Plaintiff's] cognitive efficiency," but that "[o]therwise, with social limitations, [Plaintiff] can sustain [concentration and persistence] over two hour periods over typical work day/week." *Id.* Dr. Atkins concluded that Plaintiff was "markedly limited" in interacting appropriately with the general public, and "moderately limited" in his abilities to accept instructions and respond appropriately to criticism from supervisors and his ability to get along with coworkers or peers. *Id.* In support, Dr. Atkins explained that although Plaintiff has reported difficulty with authority figures, he had been appropriate with VA treatment providers. She also noted that although Plaintiff would do best in a setting requiring little to no social interactions and should not engage with the general public, he could manage brief, routine contact with supervisors and coworkers.

**D.      January 2013 Non-Examining State Consultants' Assessments.**

After Plaintiff filed for reconsideration of the denial of his claim for benefits, on January 17, 2013 State Agency Medical Consultants Geoffrey Knisely, M.D. and Roy Shapiro, M.D. conducted a physical and mental RFC assessment. Plaintiff stated that since August of 2012 he had been experiencing increased pain in his knee and lower

10

back; that his PTSD was worse; that he had been having more frequent panic attacks; and that he had started missing therapy appointments because he could not leave his house.

Dr. Knisely conducted a physical RFC assessment based on a review of Plaintiff's updated medical records. Records from October of 2012 to January of 2013 revealed Plaintiff requested medication for pain relief; that Plaintiff walked with an antalgic gait; that Plaintiff had decreased sensation to touch in his right toes; that Plaintiff had mild crepitation; and that x-rays showed no degenerative joint disease and an MRI was normal "other than minimal anterior edema." (AR 100.) Assessing the same criteria as Dr. White, Dr. Knisely found the same exertional and postural limitations, except that he found Plaintiff could stand and/or walk for five hours during an eight hour work day.

Dr. Shapiro conducted a PRT assessment and mental RFC assessment based on Plaintiff's updated medical records. Records from August of 2012 to January of 2013 revealed that Plaintiff reported that his sleep and consequently his mood had improved with better pain medication; he had quit anger management because it "[didn't] work for him"; and he had walked out of a therapy session because he felt that his therapist had kicked him out and he now wanted a new therapist. (AR 99.) Plaintiff reported being irritable and angry and attending twice monthly support groups for veterans which he felt took the place of a therapist. Dr. Shapiro recorded that Plaintiff's mental status and affect were consistent with improving symptoms. Dr. Shapiro noted that although Plaintiff exhibited anger in terminating his therapy sessions, "he did not lose his temper, and then argued with mild rancor to be referred to a new therapist at this next session [] showing some anger control [] which seems to be his primary symptom." (AR 100.) Dr. Shapiro assessed the same "severe" impairments and recorded identical PRT and mental RFC assessments as Dr. Atkins.

### E.   Plaintiff's Testimony at the May 13, 2014 Hearing.

Plaintiff testified that his last job was working the night shift at Wal-Mart stocking shelves, which he took in order to avoid contact with people. Lifting pallets caused stress on his back, and he would often require the assistance of his co-workers. Plaintiff's OCD also caused him to work slowly, because he had to "make sure that everything was

11

straight, fronted, a straight line, everything is where it is." (AR 49.) Plaintiff stated that he had memory issues which resulted in impaired ability to finish his work in a timely manner because he would forget his supervisor's instructions. These memory issues caused tension between him and his supervisors because he would repeatedly ask for assistance. After one incident in which Plaintiff "kind of lost [his] cool," Plaintiff terminated his employment at Wal-Mart. (AR 50.)

Plaintiff testified that he has problems concentrating: "I'll go into a room for something and my girlfriend or my son will say something to me and I'll forget what I'm looking for or what I came in there to do." (AR 51.) Plaintiff explained this happens on a regular basis, and noted that he often would start a project but forget about it after an interruption. Plaintiff denied any recent alcohol or illicit drug use.

Since 1991, Plaintiff has had intrusive thoughts related to the helicopter crash he witnessed in which his best friend died. He explained that he has thoughts about this event every night and that he is on medication for his PTSD. Sometimes, when driving at night, Plaintiff sees his friend—"I don't know if it's my mind, I see like something flash on the side of me down the road, something crosses the road in front of me." (AR 59.)

With regard to his OCD, Plaintiff explained that when he goes grocery shopping, everything must be the same, whether canned goods or vegetables. He cannot tolerate dented cans, peeled labels, or damaged products. He alphabetizes his cans and his medicines and routinely maintains a particular order in how he puts on his shoes and dresses himself. When Plaintiff goes out in public, he plans his exit strategy. He needs to have a wall behind him. He experiences panic attacks about five to six times per week, where his hands will sweat and his heart will pound and he will "just want to get away." (AR 56.) These panic attacks last several hours, and can last all night.

Plaintiff has sleep apnea and only sleeps several hours per night. Plaintiff noted that "the sleep is starting to take [its] toll" and that he is "losing energy [every day]." (AR 71.) Plaintiff does not sleep in the same room as his girlfriend because he will "get angry like [he's] fighting with somebody." (AR 59.) Sometimes he will reenact the helicopter crash, and kick in his sleep.

12

Plaintiff testified that his back pain radiates down his left leg and causes his toes to go numb. He often wears a back brace and takes prescription medication for his pain, which does not completely alleviate it. Plaintiff can stand for twenty minutes before having to sit because his knees will give out, and can sit for about one to two hours at a time before his back starts to hurt. Plaintiff explained that leaning forward helps take tension off his back. Plaintiff uses a cane and wears knee braces every day.

**III.   ALJ Levin's June 12, 2014 Decision.**

In order to receive disability benefits under the SSA, a claimant must be "disabled"[3] on or before the claimant's "date last insured." *See* 42 U.S.C. § 423(a)(1)(A). A five-step, sequential-evaluation process determines whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citations omitted). "The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at steps one through four of the sequential five-step framework established in the SSA regulations." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks and citation omitted).

---

[3] Disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's "physical or mental impairment or impairments" must be "of such severity" that the claimant is not only unable to do any previous work but cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

ALJ Levin determined Plaintiff's date last insured to be December 31, 2016. At step one, ALJ Levin found that Plaintiff has not been engaged in substantial gainful activity since July 30, 2011, Plaintiff's alleged disability onset date.

At step two, ALJ Levin found that Plaintiff suffers from the following severe medical impairments: degenerative disc disease, osteoarthritis of the knees, obesity, chronic obstructive pulmonary disease, anxiety, depression, and a personality disorder. Although Plaintiff also alleged that he suffers from diabetes mellitus, hypertension, and hearing loss, ALJ Levin determined these impairments were not severe because there was insufficient evidence in the record to show any functional limitations over any continuous twelve month period. At step three, ALJ Levin found that none of Plaintiff's impairments, either singularly or combined, met or exceeded the Listings.

At step four, ALJ Levin determined Plaintiff to have the RFC to:

> [P]erform light work as defined in [20 C.F.R. § 404.1567(b)] except he requires a sit/stand option; cannot climb ladders, ropes, or scaffolds; can occasionally climb ramps or stairs; can occasionally balance, stoop, kneel, crouch or crawl; must avoid concentrated exposure to dust, gas, odors, and fumes; must avoid all hazards; is able to maintain attention and concentration for two hour increments throughout an eight hour work day; must avoid high production rates; and must avoid social interaction with the general public, but can sustain limited social interaction with coworkers and supervisors.

(AR 32.) In reaching this RFC, ALJ Levin considered Plaintiff's testimony, opinions from the State Agency Medical Consultants, and Plaintiff's treatment records. Although Plaintiff's medically determinable physical and mental impairments could reasonably be expected to cause his alleged symptoms, ALJ Levin found Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible. ALJ Levin concluded that, in light of his RFC, Plaintiff was unable to return to any past relevant work because Plaintiff's prior work experience required extended contact with the general public.

At step five, considering Plaintiff's age, education, work experience, and RFC, ALJ Levin found that there were jobs in significant numbers in the national economy that

Plaintiff could perform, including "marker" and "photocopy machine operator." (AR 36.) Accordingly, ALJ Levin concluded that Plaintiff was not disabled from July 30, 2011 through June 12, 2014, the date of his decision.

## IV.    Conclusions of Law and Analysis.

### A.    Standard of Review.

In reviewing the Commissioner's decision, the court "'conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied.'" *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). "It is the function of the Secretary, not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984) (quotation omitted) (alteration in original); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner.") (citation omitted).

The ALJ's decision must set forth findings with "sufficient specificity" to allow a court to determine whether it is supported by substantial evidence. *See Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) (explaining that although an ALJ need not reconcile "every conflict in a record," the "crucial factors" must be "set forth with sufficient specificity to enable [the court] to decide whether the determination is supported by substantial evidence").

Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "The court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir.

15

1984). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (quoting *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)).

## B. ALJ Levin's Consideration of Whether Plaintiff's Severe Impairments Meet or Medically Equal the Severity of the Listings.

Plaintiff argues that ALJ Levin erred in determining that Plaintiff's mental health impairments do not meet or equal the severity of the Listings 12.04 (Affective Disorders), 12.06 (Anxiety Related Disorders), or 12.08 (Personality Disorders) because the Paragraph B requirements were not met. Plaintiff contends that the ALJ's findings in support of this conclusion are not supported by substantial evidence in the record. Plaintiff further contends that his medical records provide substantial evidence for finding that his PTSD is disabling under the Paragraph B requirements. In addition to these alleged errors, Plaintiff argues that ALJ Levin "completely failed" to consider his OCD diagnosis and that this failure requires a remand.

The Commissioner contends that the ALJ properly assessed the evidence in concluding that the requirements of the Listings were not satisfied and that Plaintiff did not meet his burden of proof. The Commissioner further contends that although ALJ Levin did not expressly cite to specific evidence regarding Plaintiff's OCD diagnosis, the record is sufficient to permit this court to glean the ALJ's rationale.

At step three, an ALJ is required to determine whether a claimant has an impairment or combination of impairments that meet or equal the criteria for an impairment listed in the regulations. "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits." *Dixon v. Shalala*, 54 F.3d 1019, 1022 (2d Cir. 1995).

To meet the requirements of Listing 12.04, a claimant must demonstrate the "[m]edically documented persistence, either continuous or intermittent," of one of the

16

symptoms listed in Paragraph A and at least two of the following from Paragraph B: (1) marked restriction in activities of daily living; (2) marked difficulties in social functioning; (3) marked difficulties in maintaining concentration, persistence, and pace; or (4) repeated episodes of decompensation, each of extended duration. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.04(A)-(B). "Marked" means "more than moderate but less than extreme." *Id.* § 12.00(C) ("Assessment of severity."). "A moderate limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Id.*

Alternatively, under Paragraph C of Listing 12.04, a claimant must show a "[m]edically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities," with at least one of the following: (1) repeated episodes of decompensation, each of extended duration;[4] or (2) a residual disease process that resulted in such a marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living environment. *Id.* § 12.04(C).

---

[4] The regulations explain that:

> Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace.
>
> . . .
>
> The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00(C)(4).

To satisfy the requirements of Listing 12.06, a claimant must show "[m]edically documented findings" evidencing at least one of the specific symptoms set forth in Paragraph A, and at least two of the requirements from Paragraph B, which are the same as in Listing 12.04. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.06(A)-(B). If Paragraph B's criteria are not satisfied, a claimant must show the specific symptoms listed in Paragraph A together with Paragraph C's requirement of demonstrating a "complete inability to function independently outside the area of [the claimant's] home." *Id.* at § 12.06(C).

To meet Listing 12.08's requirements, a claimant must show "[d]eeply ingrained, maladaptive patterns of behavior" associated with one of the symptoms listed in Paragraph A, and at least two of the requirements of Paragraph B, which are the same as in Listings 12.04 and 12.06.

ALJ Levin's analysis of whether Plaintiff's mental impairments, considered singly or in combination, met or medically equaled Listings 12.04, 12.06, or 12.08 focused primarily on whether the Paragraph B factors had been met: (1) marked restriction in activities of daily living; (2) marked difficulties in social functioning; (3) marked difficulties in maintaining concentration, persistence, and pace; or (4) repeated episodes of decompensation, each of extended duration.[5] ALJ Levin concluded that Plaintiff's "mental impairments do not cause at least two 'marked' limitations or one 'marked' limited and 'repeated' episodes of decompensation, each of extended duration." (AR 31.)

In support of this conclusion, ALJ Levin found that that Plaintiff "has . . . reported that he maintains a tropical fish tank, watches television, and uses a computer to engage with his medical providers." (AR 31.) Plaintiff contends these findings are without

---

[5] ALJ Levin appears to have concluded that Plaintiff satisfied the Paragraph A criteria for all three Listings because he did not address that issue and because, had Plaintiff failed to satisfy the Paragraph A criteria, there would be no need to address Paragraph B.

18

evidentiary support and, in any event, are insufficient to support a conclusion that he can perform any job in the national economy.[6]

ALJ Levin further determined that Plaintiff's mental impairments impose a "mild" limitation on his activities of daily living.[7] ALJ Levin found that Plaintiff is able to care for his own needs, maintain adequate hygiene, and manage his daily activities. (AR 216-18) (Plaintiff reported that his "daily activities" consist of taking care of his son (cooking, laundry, and taking him places), caring for his cats, cooking meals for himself twice a day, cleaning, doing laundry, doing yard work, shopping for food and clothes, and paying bills). The ALJ further found that Plaintiff works on cars, plays acoustic guitar, works on and rides his motorcycle, hunts, and practices with firearms at a shooting range. (AR 219) (watches TV); (AR 565) (plays acoustic guitar); (AR 571) (Plaintiff attended "shooting range"). The ALJ's findings are thus supported by sufficient evidence in the record.

Plaintiff's argument that the ALJ's findings have no bearing on whether he could perform a reasonable number of jobs in the national economy is misplaced. At step three, the issue is whether a claimant's impairments require a conclusion that he or she is disabled. *See Dixon*, 54 F.3d at 1022 (explaining that "[i]f a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits"). ALJ Levin was not required at step three to consider whether there are sufficient jobs in the national economy for which the identified activities are relevant.

Plaintiff's challenge to ALJ Levin's finding that Plaintiff's "medical records document[] that he has difficulty with anger management, but that he has been able to

---

[6] Substantial evidence in the record supports ALJ Levin's findings that Plaintiff engages in these activities. *See* AR 1244 (Plaintiff reported to Fred Elliott that his "leisure activities" consist of tropical fish, watching television, riding his motorcycle, and hunting); AR 1050 (e-mail from Plaintiff to his primary care provider thanking the hospital staff for assisting him at a walk-in visit and confirming an upcoming appointment).

[7] The regulations define activities of daily living to include "adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00(C)(1).

19

engage in warrior retreat training for combat veterans, sustain romantic relationships, and socialize with friends" fares no better. (AR 31.) Plaintiff contends that the evidence cited by ALJ Levin in support of these findings "state[s] nothing of the kind." (Doc 12-1 at 9.) Plaintiff also argues that the evidence relied upon by ALJ raises questions about the fairness of the ALJ's decision.

Under the second Paragraph B criteria, ALJ Levin analyzed Plaintiff's "social functioning," which is defined as a claimant's "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals" and "includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00(C)(2). ALJ Levin determined that the "evidence as a whole establishes [a] moderate degree of limitation in [Plaintiff's] social functioning." (AR 31.) In addition to the cited activities that Plaintiff now challenges,[8] ALJ Levin found that Plaintiff was able to respond appropriately, carry on a conversation, and did not demonstrate disruptive behavior. The ALJ also found that although Plaintiff testified that his activities involve little interaction with other individuals and that he preferred to stay home, Plaintiff was able to respond appropriately and maintain a conversation at the hearing, he "does not exhibit any great

---

[8] The ALJ cited evidence to support his findings that Plaintiff engaged in warrior retreat training, *see* AR 590 (reporting that Plaintiff attended a five-day retreat at "The Warrior Connection" where he discussed, in part, his desire not to be angry) and that Plaintiff socializes with friends, *see* AR 580 (stating that Plaintiff discussed spending time with a female friend over the weekend); AR 742 (Plaintiff informed Dr. Isenberg that he enjoyed activities with his friends, including "riding motorcycles, watching movies, going to the gun range, and getting together for fun"). Plaintiff correctly points out that AR 1242 discusses Plaintiff's "struggles with OCD" and his obsession with counting and aligning items in alphabetical order. It, however, also provides "substantial evidence" for ALJ Levin's finding that Plaintiff suffers from anger issues. *See* AR 1242 (Plaintiff reported his "main problem" as "coping with stuff" and that he "gets angry with 'stupid people'" and that he "gets angry when people do something he has asked them not to"); *see also* AR 891 (at his first meeting with Dr. Wood, Plaintiff stated: "I have issues with anger" and that he "wants help specifically for his anger issues"). There is also evidence in the record that Plaintiff has engaged in several long-term romantic relationships. *See* AR 588 (in July of 2012 Plaintiff discussed break-up with his girlfriend of two years with therapist); AR 1381 (in November of 2013 Plaintiff discussed celebrating his one year anniversary with his girlfriend and noted that the relationship was "going well").

Case 2:15-cv-00255-cr   Document 18   Filed 01/26/17   Page 21 of 29

limitation in one-to-one interaction and does not have anti-social behavior patterns, as evidenced by his ability to go out when required," and he has advocated for his son by meeting with his son's teachers. *Id.* Because ALJ Levin's findings are supported by substantial evidence in the record, there is no factual basis to challenge the fairness of ALJ Levin's determination. This remains true even if the court could analyze the same evidence and reach a different conclusion.[9]

Finally, there is no merit to Plaintiff's argument that ALJ Levin "completely failed" to consider Plaintiff's OCD diagnosis. At the administrative hearing, ALJ Levin questioned Plaintiff and his attorney regarding whether degenerative disc disease, osteoarthritis, obesity, COPD, anxiety, depression, personality disorder, diabetes, hearing loss, and hypertension were the major impairments in Plaintiff's medical records. Plaintiff responded that he also suffers from OCD, to which ALJ Levin responded, "Okay. That would kind of fall under the anxiety heading." (AR 48.) ALJ Levin proceeded to consider Listing 12.06 which covers anxiety related disorders. Accordingly, although ALJ Levin did not expressly address Plaintiff's OCD, the record reflects that he considered it in his analysis.[10] *See Brault*, 683 F.3d at (explaining that an "ALJ's failure to cite specific evidence does not indicate that such evidence was not considered"); *see also Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When . . . the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he

---

[9] *See Genier*, 606 F.3d at 49 ("Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence.") (quoting *Schauer*, 675 F.2d at 57); *see also Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (explaining that "[a]lthough required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted" and "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered") (internal citations and quotation marks omitted); *Valente*, 733 F.2d at 1041 (explaining that the Commissioner's judgment on the basis of her factual determinations "is entitled to considerable deference" and the court may not substitute its own judgment "even if it might justifiably have reached a different result upon a *de novo* review").

[10] In determining Plaintiff's RFC, ALJ Levin relied upon exhibits 2F, 13F, 14F, 18F, and 19F. Exhibits 18F and 19F contain, in large part, the treatment records of Dr. Elliott, who, from May of 2013 to March of 2014, was Plaintiff's treating psychologist for Plaintiff's OCD and PTSD.

21

have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.").

## C.    ALJ Levin's Assessment of Plaintiff's RFC.

Plaintiff raises several challenges to ALJ Levin's determination of Plaintiff's RFC, stating that ALJ Levin should have credited Plaintiff's allegations of disabling back and knee pain because they are supported by the objective medical evidence. He also points out that ALJ Levin failed to discuss the VA's disability determination.[11]

Alternatively, Plaintiff argues that ALJ Levin erred in applying the factors set forth in Social Security Ruling 96-7p in concluding that Plaintiff's allegations of disabling back and knee were not credible. Plaintiff further contends there is no support for ALJ Levin's RFC determination that Plaintiff is able to maintain concentration for two hour increments in an eight hour work day.

In evaluating whether a claimant is disabled, an ALJ must determine whether a claimant who has severe impairments nonetheless has the RFC to perform available work. *See* 20 C.F.R. § 404.1520. "RFC is not the *least* an individual can do despite his

---

[11] Plaintiff notes that the VA has determined Plaintiff's overall service-connected disability rating to be 90%—70% for PTSD, 20% for physical ailments. In the Second Circuit, the VA's determination of disability, while not binding on the Commissioner, is entitled to "some weight" and should be considered. *See Cutler v. Weinberger*, 516 F.2d 1282, 1285-86 (2d Cir. 1975); *see also McCartey v. Massanari*, 298 F.3d 1072, 1075 (9th Cir. 2002) ("No circuit has held that an ALJ is free to disregard a VA disability rating."). ALJ Levin did not expressly address the VA's service-connected disability ratings in his decision although it is clear from the transcript of the hearing that he was aware of them. *See* AR 47 ("So the impairments that I see in the record for—oh, I also one other thing. I also see that you have a VA disability rating of 90% for PTSD, is that correct?"). ALJ Levin also considered the evidence underlying the VA's disability determinations. *See* AR 35 (discussing Dr. Isenberg's PTSD evaluation of Plaintiff as part of the VA's disability evaluation). Any error in ALJ Levin's failure to specifically address the VA's disability determination was therefore harmless. *See Pelkey v. Barnhart*, 433 F.3d 575, 579 (8th Cir. 2006) ("Although he did not specifically mention the 60 percent figure, the ALJ did not err because he fully considered the evidence underlying the VA's final conclusion that Pelkey was 60 percent disabled."); *Blessing v. Colvin*, 2015 WL 7313401, at *10 (N.D.N.Y. Nov. 19, 2015) ("However, having carefully considered the circumstances of this case (in which the ALJ fully considered the underlying evidence for the VA's determination), and having found that the ALJ's decision is supported by substantial evidence, the Court finds any error to independently assign the VA's determination a specific weight to be harmless.").

22

or her limitations or restrictions, but the *most*." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). In making this determination, an ALJ is required to consider the claimant's reports of pain and other limitations, but is not required to accept the claimant's subjective complaints without question. Instead, an ALJ may exercise discretion in weighing the credibility of the claimant's testimony in light of other evidence in the record. *See Genier*, 606 F.3d at 49.

SSA regulations provide that when an ALJ determines that a claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged, the ALJ must next consider the extent to which the claimant's alleged symptoms can reasonably be accepted as consistent with the evidence of record. *See* 20 C.F.R. § 404.1529; *see also* SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Where a claimant's symptoms are not substantiated by objective medical evidence, the ALJ "must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." *Id.* at *2.[12] "[T]he ALJ's reasons for discounting a claimant's subjective complaints must be set forth with 'sufficient specificity to enable [the district court] to decide whether the determination is supported by substantial evidence.'" *Castellano v. Astrue*, 2008 WL 2951925, at *7 (S.D.N.Y. July 30, 2008) (quoting *McClain v. Barnhart*, 299 F. Supp. 2d 309, 323-24 (S.D.N.Y. 2001)).

In this case, although Plaintiff was diagnosed with degenerative disc disease and osteoarthritis of the knees, which are complicated by his mild obesity, ALJ Levin determined that Plaintiff's allegation of severe physical restrictions from these impairments was not supported by the objective evidence in the record and that Plaintiff's

---

[12] The regulations provide several factors which the ALJ must consider including: the claimant's daily activities; the location, duration, frequency, and intensity of the pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the pain or other symptoms; treatment, other than medication, to relieve the pain or other symptoms; any measures other than treatment used to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations due to pain or other symptoms. *See* 20 C.F.R. § 404.1529(c)(3)(i)-(vii); *see also* SSR 96-7p, at *3.

statements concerning the intensity, persistence and limiting effects of these alleged symptoms were not entirely credible.

In determining that the objective medical evidence did not support Plaintiff's allegations of pain, ALJ Levin found that radiographic evidence of Plaintiff's back and knees revealed only mild degenerative changes. The ALJ further noted that although Plaintiff testified that he requires a cane due to knee pain, the medical records do not establish that a cane was prescribed.[13] Additionally, ALJ Levin found that Plaintiff was consistently noted to have a satisfactory gait, was able to heel and toe walk, and retained normal balance.

Plaintiff testified that he can only sit for short periods of time; however, he reported no difficulties in traveling to Florida. Similarly, although he complained of increased symptoms after long bike rides and raking the lawn, he did not forego those activities. Plaintiff's treatment records further revealed that he was able to work on cars, play acoustic guitar, ride and work on his motorcycle, go hunting, and practice with firearms at a shooting range, which ALJ Levin found "evidences an ability to perform at least light level exertional work activities." (AR 34.) Plaintiff reported that his pain was well managed with Vicodin and other medications. ALJ Levin also relied on Plaintiff's statement that he would look for work if he was denied disability benefits. The ALJ's findings are supported by substantial evidence in the record and, in turn, support his determination that the objective medical evidence in the record does not substantiate Plaintiff's allegations of disabling back and knee pain. Indeed, Plaintiff does not contend otherwise. Rather, he asserts that the record establishes only the continued worsening of his symptoms. This is not a basis for reversal. *See Genier*, 606 F.3d at 49 ("Even where the administrative record may also adequately support contrary findings on particular

---

[13] During a primary care visit on March 8, 2010 in which it was noted that Plaintiff was "[w]alking stiff legged with limp" and that his knee was "very tender diffusely to even light touch," treatment notes state: "Brace and cane . . . provided." (AR 512.) Although perhaps a matter of semantics, ALJ Levin's finding that Plaintiff was never "prescribed" a cane appears to be accurate.

24

issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence.").

Because ALJ Levin found Plaintiff's allegations about his symptoms were not supported by objective medical evidence, the ALJ was required to make a finding regarding Plaintiff's credibility and give specific reasons therefor. *See* SSR 96-7p, at *3 ("Because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, any statements of the individual concerning his or her symptoms must be carefully considered if a fully favorable determination or decision cannot be made solely on the basis of objective medical evidence."). ALJ Levin satisfied this standard by explaining that "[t]he discrepancies between [Plaintiff's] allegations and the objective medical record, supported by the treatment records of [Plaintiff's] physicians and the diagnostic evidence, cannot be resolved in [Plaintiff's] favor based on this record." (AR 34.) He discussed Plaintiff's activities and concluded that "the nature, duration and frequency of [Plaintiff's] pain resulted in only minimal actual functional limitation based on his own description of his daily activities and the treatment notes of his examining physicians." *Id.* ALJ Levin's decision reveals that he considered all of the evidence in the record and evaluated appropriate factors. To the extent Plaintiff argues that ALJ Levin should have considered each factor under SSR 96-7p separately, he was not required to do so. *See Blasco v. Comm'r of Soc. Sec.*, 2014 WL 3778997, at *3 (N.D.N.Y. July 31, 2014) ("Although the ALJ did not undertake a step-by-step exposition of the factors articulated in 20 C.F.R. § 404.1529(c), '[f]ailure to expressly consider every factor set forth in the regulations is not grounds for remand where the reasons for the ALJ's determination of credibility are sufficiently specific to conclude that he considered the entire evidentiary record.'") (quoting *Judelsohn v. Astrue*, 2012 WL 2401587, at *6 (W.D.N.Y. June 25, 2012)).

As part of Plaintiff's RFC, ALJ Levin determined that based on Plaintiff's daily activities he "is able to maintain attention and concentration for two hour increments throughout an eight hour work day." (AR 32.) Plaintiff alleges this determination is "created out of whole cloth" and has no basis in the evidence. (Doc. 12-1 at 14.)

25

However, ALJ Levin's finding is not clearly erroneous and is supported by the opinion of Dr. Atkins that, although Plaintiff was "moderately limited" in his ability to maintain attention and concentration for extended periods, Plaintiff could sustain concentration and persistence over two hour periods during a typical work day. (AR 91.) Because substantial evidence in the record supports ALJ Levin's RFC determination that Plaintiff is limited to maintaining attention and concentration for two hour increments throughout an eight hour work day, that determination is not grounds for reversal.

## D.    Whether ALJ Levin Demonstrated Bias Toward Plaintiff.

Plaintiff contends that the number and extent of ALJ Levin's alleged errors supports a conclusion that he was biased against him,[14] necessitating a remand to a different ALJ. The Commissioner responds that Plaintiff has not met his burden of establishing that ALJ Levin "engaged in conduct so extreme that it deprived the hearing of the fundamental fairness mandated by due process." (Doc. 17 at 19.)

A claimant seeking administrative review of an application for DIB benefits is entitled to a hearing before an impartial and unbiased ALJ. *See Schweiker v. McClure*, 456 U.S. 188, 195 (1982) ("[D]ue process demands impartiality on the part of those who function in judicial or quasi-judicial capacities."). There is a presumption that administrative adjudicators, such as ALJs, are unbiased, *id.* at 195–96, and that they exercise their decision-making authority with honesty and integrity. *See Withrow v. Larkin,* 421 U.S. 35, 47 (1975). To rebut this presumption, a plaintiff must demonstrate a conflict of interest or some other specific reason for disqualification. *See Schweiker*, 456 U.S. at 195. A plaintiff may also show that the ALJ engaged in conduct so extreme that it deprived the hearing of the fundamental fairness mandated by due process. *See Liteky v. United States*, 510 U.S. 540, 555–56 (1994). "Such impermissible conduct must be clear from the record and 'cannot be based on speculation or inference.'" *Pabon v.*

---

[14] Plaintiff cites to an array of alleged legal errors, including those discussed *supra*, as well as claims, without adequate explanation, that ALJ Levin failed to comply with the treating physician's rule and failed to comply with his obligation to fully develop the record. Plaintiff also alleges that "the tone of the hearing was adversarial," and that ALJ Levin "cherry picked" and "falsified" portions of the record. (Doc. 12-1 at 21.)

*Comm'r of Soc. Sec.*, 2015 WL 4620047, at *5 (S.D.N.Y. Aug. 3, 2015), *report and recommendation adopted sub nom. Pabon v. Colvin*, 2015 WL 5319265 (S.D.N.Y. Sept. 11, 2015) (quoting *Card v. Astrue*, 752 F. Supp. 2d 190, 191 (D. Conn. 2010)). Alleged legal errors are insufficient to establish bias. *See Lebron v. Colvin*, 2015 WL 1223868, at *24 (S.D.N.Y. Mar. 16, 2015) ("Legal error alone is insufficient to support a finding of bias."). "For this reason, a claimant bringing a due process claim faces a difficult burden." *Pabon*, 2015 WL 4620047, at *5.

Plaintiff has failed to meet this "difficult burden." There is no indication that Plaintiff or his counsel previously voiced any concern that the May 13, 2014 hearing was "adversarial." Plaintiff's arguments rely to the contrary only on conclusory contentions of bias without citation to the record. Although Plaintiff correctly observes that an ALJ has an obligation to develop the record, he provides no evidence that the ALJ failed to fulfill this obligation or that he "cherry-picked" or "falsified" facts.

### E.    Whether Evidence From March of 2016 Requires a Remand.

Finally, Plaintiff argues that a one-page letter dated March 16, 2016 from one of Plaintiff's medical service providers who began treating Plaintiff for PTSD on December 3, 2015 is grounds for a remand. The letter provides:

> Dear George:
>
> We began individual treatment on December 3, 2015 for PTSD. Specifically, you report rumination, a high level of hypervigilance, arousal, and re-experiencing, meeting criteria for PTSD. You report challenges with interpersonal situations, including when talking with individuals in authority who may address you gruffly, very likely increasing the level of the above criteria. We have talked about the effort you apply to manage your own irritability and reactivity in day to day situations. Given the nature of your profession as a master mechanic, the sounds, interactions and other environmental situations, you report that you re-experience traumatic situations from your military service. Physical pain also reportedly adds to the challenges in managing consistent, reliable keeping to a schedule for work, as well as personal activities. You report that you use alcohol with some increase during particularly stressful situations, but also attend AA given your awareness of the co-morbidity of alcohol use and PTSD. You also state that you carefully choose where you go, given the limited settings that you feel safe in and can continue self-managing

outbursts, abrupt changes in mood and perception and reactivity while there.

Given the information you have shared in our meetings twice a month, and the likelihood that you cannot consistently manage symptoms of active PTSD, it is my belief that you meet criteria for unemployability, but also that it is not unreasonable to ask that VBA consider an increase to 100% P&T.

(Doc. 12-2.)

Title 42, Section 405(g) provides that "[t]he court . . . may at any time order additional evidence to be taken . . . , but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." Because the letter is dated two years after ALJ Levin's decision, the evidence is "new" and Plaintiff had "good cause" for not submitting it to the ALJ. *See Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004) ("Because the new evidence submitted . . . did not exist at the time of the ALJ's hearing, there is no question that the evidence is 'new' and that 'good cause' existed for [plaintiff's] failure to submit this evidence to the ALJ.").

New evidence is "material" if it is both (1) "relevant to the claimant's condition during the time period for which benefits were denied" and (2) "probative." *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir.1988) (internal quotation marks omitted). "The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently." *Id.*

In the instant case, the March 2016 letter is not material because it is not relevant as to Plaintiff's condition during the time period for which benefits were denied, July of 2011 through June 12, 2014, and it is not probative of Plaintiff's PTSD condition as it existed then. The letter does not suggest that its subject matter relates to a time period earlier than that for which service was provided (December of 2015 through March of 2016) and it does not indicate that Plaintiff's condition was more serious than previously thought, nor does it reveal any previously unknown impairments. It does not contain any new diagnostic or evaluative evidence but merely summarizes information Plaintiff

28

provided to his treatment provider in December of 2015 regarding his symptoms at that time.  There is thus no "reasonable probability" that the letter would influence the Commissioner to reevaluate Plaintiff's DIB claim for the period extending from July of 2011 through June of 2014.  Remand on this basis is therefore not warranted.  *Cf.* *Pollard*, 377 F.3d at 193-94 (remanding for consideration of "new evidence" where the evidence revealed that the claimant's "condition was far more serious than previously thought and that additional impairments existed when [the claimant] was younger" and that consideration of this new evidence created "at minimum a reasonable possibility" that the ALJ would find the claimant more limited under the regulations than without the new evidence).

## CONCLUSION

For the foregoing reasons, the court DENIES Plaintiff's motion to reverse (Doc. 12) and GRANTS the Commissioner's motion to affirm (Doc. 17).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _26th_ day of January, 2017.


Christina Reiss, Chief Judge
United States District Court